1

2

3

4

5

6

7

8                              **UNITED STATES DISTRICT COURT**

9                              **EASTERN DISTRICT OF CALIFORNIA**

10

11   JULIE MARIE SABI POLO,                    Case No. 1:25-CV-01342 JLT HBK

12                    Petitioner,              ORDER GRANTING PRELIMINARY
                                               INJUNCTION[1]
13   v.
                                               (Doc. 2)
14   CHRISTOPHER CHESTNUT, ET AL.,

15                    Respondents.

16   **I.    INTRODUCTION**

17          Julie Marie Sabi Polo, a 42-year-old native of Colombia, (Doc. 2-1 at 2 (Ex. A)), left her

18   home country to escape domestic abuse, community violence that manifested in the killings of

19   family members, (Doc. 2-1 at 4–8 (Ex. B), ¶¶ 3-6), and threats and harassment she suffered

20   because of her sexual orientation. (*Id*. at ¶¶ 6–9.) Petitioner initially fled to Mexico, (*id*.), but,

21   after continuing to face harassment there, decided to enter the United States. (*Id*. at ¶ 10.)

22          Mrs. Sabi Polo crossed the border into the United States on or about December 10, 2021,

23   at or near Mexicali, California and turned herself in to U.S. immigration authorities, (Doc. 1,

24   ¶ 21), who released Petitioner after several days in detention "in accordance with Section 236 of

25   the Immigration and Nationality Act." (*Id*.) In doing so, immigration officials necessarily

26   ───────────────

27   [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
     preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
     required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
28   granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
     Preliminary Injunction.

1   determined that Mrs. Sabi Polo did not present a risk of flight or danger to the community. *See* 8

2   C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the officer's

3   discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at

4   section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction

5   of the officer that such release would not pose a danger to property or persons, and that the alien

6   is likely to appear for any future proceeding.").

7        In early 2022, Petitioner filed an asylum application and in June 2022 attended a required

8   biometrics appointment. (Doc. 1, ¶ 22.)

9        While on release, Ms. Sabi Polo obtained employment as a cook at a senior living facility

10   in Belmont, California, where she has been employed since mid-2024. (Doc. 2-1 at 36–39 (Ex.

11   K).) She also met and married her US citizen spouse in December 2023. (Doc. 1, ¶ 23; Doc. 2-1

12   at 16-18 (Ex. E).) On July 31, 2025, her spouse filed a family immigration petition under INA

13   Sec. 201(b) on Petitioner's behalf. (Doc. 1, ¶ 22; Doc. 2-1 at 20 (Ex. F).)

14        The record contains positive letters of support submitted by co-workers, friends, and

15   acquaintances. (*Id*. at 51–59.) Petitioner's spouse also submitted a letter of support, describing

16   Petitioner as a "woman of integrity, respectful of this country's laws, hardworking, and with

17   strong moral, social, and cultural values." (Doc. 2-1 at 47–48.) Petitioner provides financial

18   support for her aunt in Columbia who is undergoing treatment for breast cancer. (*Id*., at 5, ¶ 14.)

19   Ms. Sabi Polo's spouse also struggles with psychological conditions for which she is under

20   treatment, and in which Ms. Sabi Polo actively participates. (*Id*., ¶ 16–17.) Her spouse also

21   struggles to pay rent and other expenses, obligations that Petitioner has been assisting with while

22   out of custody. (*Id*. at 6, ¶ 19–20.)

23        In late July or August 2025, Mrs. Sabi Polo received a letter (dated June 11, 2025) from

24   USCIS related to her asylum claim. (Doc. 1, ¶ 24.) The letter indicated her asylum claim had been

25   dismissed because she has been "apprehended by DHS officials, placed in expedited removal, and

26   issued a Form I-860, Notice and Order of Expedited Removal." (Doc. 1, ¶ 24; Doc. 2-1 at 22 (Ex.

27   G).) Confused about the letter's contents, Mrs. Sabi Polo traveled to the ICE office in San

28   Francisco, California, to inquire about the status of her asylum application. (Doc. 1, ¶ 24.) On or

about August 25, 2025, she was detained and taken into ICE custody. (*Id*.) After being taken into custody, Mrs. Sabi Polo was provided with a Form I-860, Notice and Order of Expedited Removal, dated August 25, 2025. (Doc. 1, ¶ 24; Doc. 2-1 at 24–5 (Ex. H).)

She was then transferred to the Mesa Verde ICE Processing Center in Bakersfield, California, where, on September 5, 2025, she was given a credible fear interview without counsel present. (Doc. 1, ¶ 25; Doc. 2-1 at 27–31 (Ex. I).) At the conclusion of interview, the asylum officer found Petitioner had established a credible fear of persecution, (*id*.), and, as a result, cancelled her expedited removal proceedings and issued her a Notice to Appear (NTA) for immigration court that charged her with being present in the United States without inspection and with having no valid immigration visa or other valid entry document. (*Id*.; Doc. 2-1 at 33 (Ex. J).) The asylum officer who completed the NTA did not identify Petitioner as an arriving alien even though a check box is available within the NTA form to do so. (*Id*.)

At an immigration hearing on September 24, 2025, the IJ explained to Petitioner and counsel that the IJ had no jurisdiction to consider request for bond hearing and release pursuant to BIA decision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). (Doc. 2-4, ¶¶ 4-5.) Case reset for hearing October 28, 2025. (Doc. 1, ¶ 26.)

On October 8, 2025, Mrs. Sabi Polo filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that her detention violates her Fifth Amendment due process rights as well as the INA. (Doc. 1.) She simultaneously filed an ex parte motion for a temporary restraining order seeking immediate release if she is not provided a custody hearing under INA § 1226(a) within seven days. (Doc. 2.)

On October 9, 2025, the Court issued a Minute Order expressing the preliminary belief that Petitioner likely can demonstrate that her circumstances warrant immediate release. (Doc. 4.) On October 10, the Court requested that the parties cooperate to file more legible copies of documents attached to the petition. (Doc. 7.)

On October 13, 2025, Respondents filed a three-page opposition to Petitioner's TRO request. (Doc. 8) Therein, Respondents essentially advanced only one argument in favor of Petitioner's continued detention: that she "has not been admitted" to the United States and instead

1    is an "applicant for admission" subject to mandatory detention under 8 U.S.C. § 1225(b). (*Id.* at

2    2.) Respondents waived oral argument as to the TRO. (*Id.* at 1.)

3        For the reasons set forth below, the Court converts the matter to a motion for preliminary

4    injunction and **GRANTS** the motion.

5    **II.    LEGAL BACKGROUND**

6        Two statutes govern the detention and removal of inadmissible noncitizens from the

7    United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as

8    relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v.*

9    *Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

### A. Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance.

*See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

**B. Expedited Removal and Mandatory Detention (§ 1225)**

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has

designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,' " that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while

their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

### C. <u>The Government's Recent Change in Position</u>

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)). . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025)

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

///

///

**III.      ANALYSYS**

    **A.      Jurisdiction**

        1.      <u>Habeas Corpus</u>

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts they are being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Petitioner seeks immediate release from custody, which she contends violates the Constitution of the United States. (*See* Doc. 1.) Thus, Petitioner properly invokes the Court's habeas jurisdiction.

        2.      <u>Judicial Review Under the INA</u>

The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there are no final removal orders at issue here. The Court is also not reviewing the executive's decision to conduct removal proceedings against Petitioner. Thus, the Court has jurisdiction to review the authority under which Respondents claim to detain Petitioner as well as whether that detention comports with constitutional and statutory requirements. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

    **A.      Injunctive Relief**

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

1   the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

2   "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

3   (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

4   test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

5   1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

6   *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

7   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

8   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

9   the issuance of a preliminary injunction where there are "serious questions on the merits … so

10  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

11  injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

12  never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to

13  "merely to preserve the relative positions of the parties until a trial on the merits can be held, and

14  to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S.

15  Ct. 659, 667 (2025) (citations omitted).

16      The status quo refers to "the last uncontested status which preceded the pending

17  controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

18  *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

19  Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

20  CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

21  order requiring immediate release of the petitioner back to home confinement from custody, as a

22  restoration of the status quo).

23      Even if the Court's action here constitutes a mandatory injunction,[2] the evidence supports

24

25  _____

[2] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

26

27

28

9

1  that action. Petitioner alleges she has suffered and is suffering violations of her substantive and

2  procedural due process rights and that his continued unlawful detention will impose on her and

3  his family serious injury if the injunction does not issue. The injunction issued here is on firm

4  legal footing. As discussed below, due process requires that Petitioner be given pre-deprivation

5  process. Because DHS failed to do so and there have been no changed circumstances, immediate

6  release is appropriate. These injuries are not capable of redress through monetary compensation.

7  Accordingly, injunctive relief is appropriate even under the higher standard for mandatory

8  injunctions.

9           1.    Likelihood of Success on the Merits

10          This first factor "is the most important" under *Winter*, and "is especially important when a

11  plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

12  Cir. 2023).

13              a.    *Respondents Rely on an Incorrect Interpretation of § 1225 for the*

14                   *Authority to Detain Petitioner*

15          Respondents' central argument is that Mrs. Sabi Polo is subject to mandatory detention

16  pending removal proceedings under 8 U.S.C. § 1225(a)(1), 1225(b)(2)(A). (Doc. 8 at 1.)

17  Respondents admit that the legal arguments relied upon by DHS to support this assertion are well

18  known to and have been rejected by this Court in other proceedings. (*Id.* (citing *Ortiz Donis v.*

19  *Chestnut,* 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9, 2025).) In *Ortiz*

20  *Donis*, and other cases, Respondents have relied on the BIA's recent decision in *Yajure Hurtado*

21  affirming the government's new interpretation of § 1225. This Court has reviewed and considered

22  the government's interpretation adopted by *Yajure Hurtado*. Again in the interest of expedience,

23  the Court relies on the analysis set forth in detail in *Salcedo*:

24              Ms. Salcedo Aceros argues that § 1225(b)(2) does not apply to
                noncitizens like her, who have been released by DHS on their own
25              recognizance into the interior of the country. Dkt. No. 17 at 4. A
                number of district courts that have examined this issue in recent
26              months have so held. These courts have rejected the Government's
                expansive construction of § 1225(b)(2), which would allow it to
27              detain without a hearing virtually any noncitizen not lawfully
                admitted. These courts examined the text, structure, agency
28              application, and legislative history of 1225(b)(2) and concluded that

it applies only to noncitizens "seeking admission," a category that does not include noncitizens like Ms. Salcedo Aceros, living in the interior of the country. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of Sections 1225 and 1226, together with the structure of the larger statutory scheme, indicates that Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney General while residing in the United States."); *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) (holding 1225(b)(2) "clearly" not applicable to noncitizens who have resided in the country for years); *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *29 (D. Ariz. Aug. 11, 2025) (finding that the Government's "selective reading" of 1225(b)(2) "violates the rule against surplusage and negates the plain meaning of the text"); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (rejecting the Government's "novel interpretation" that 1225(b) applies to noncitizens detained while present in the United States); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (holding that Section 1226, not 1225(b)(2), governed inadmissible noncitizens residing in the country).

The Government has not pointed to a single district court that has agreed with its construction of 1225(b)(2). Instead, the Government points to a recent BIA decision agreeing with its interpretation. Dkt. No. 22 (citing *Matter of Jonathan Javier Yajure Hurtado*, 29I & N Dec. 216 (BIA 2025)). There, the BIA held that Section 1225(b)(2) prescribes mandatory detention for all inadmissible noncitizens living in the United States. For the reasons discussed below, the Court finds the conclusion of the district courts more persuasive than the BIA's new ruling.

First, the BIA decision is entitled to little deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (observing that while "agencies have no special competence in resolving statutory ambiguities," "[c]ourts do"). Under *Skidmore*, the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In this regard, the BIA's current position is inconsistent with its earlier pronouncements. Prior to its September 5 decision, the BIA issued three non-precedential decisions taking the *opposite* position. *See Martinez*, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025). In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. *Id.* Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time." *Loper*, 603 U.S. at 386; *see also Skidmore*, 323 U.S. at 140. Moreover, the BIA's reasoning lacks persuasive power for several reasons.

*i.*

11

1

2     As with any question of statutory interpretation, the Court begins
      with the relevant statutory provisions. § 1225(a) defines an
3     applicant for admission as:

4          "[a]n alien present in the United States who has not been
           admitted or who arrives in the United States (whether or not
5          at a designated port of arrival and including an alien who is
           brought to the United States after having been interdicted in
6          international or United States waters) ..."

7     § 1225(b)(2)(A) states:

8          "[I]n the case of an alien who is an applicant for admission,
           if the examining immigration officer determines that an
9          alien seeking admission is not clearly and beyond a doubt
           entitled to be admitted, the alien shall be detained for a
10         proceeding under section 1229a of this title."

11    The Government argues and the BIA agreed that every noncitizen
      who has not been lawfully admitted to the United States continues
12    to be a noncitizen "seeking admission" and thus subject to
      § 1225(b)(2). In other words, it treats the phrases "applicant for
13    admission" and "seeking admission" as synonymous.

14    But this reading would render the phrase "seeking admission" in
      § 1225(b) superfluous. To qualify for § 1225(b)(2), a noncitizen
15    must (1) be an applicant for admission, (2) be "seeking admission",
      and (3) be "not clearly and beyond a doubt entitled to be admitted."
16    If, as the Government argues, all applicants for admission are
      deemed to be "seeking admission" for as long as they remain
17    applicants, then the phrase "seeking admission" would add nothing
      to the provision. This "violates the rule against surplusage." *Lopez*
18    *Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at
      *6 (S.D.N.Y. Aug. 13, 2025); *see also United States, ex rel.*
19    *Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023)
      ("[E]very clause and word of a statute should have meaning.");
20    *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause,
      sentence, or word shall be superfluous, void, or insignificant.")
21    (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

22    Moreover, the Government's and the BIA's reading of "seeking
      admission" is unnatural and ignores the tense of the term. As one
23    district court observed:

24         "[S]omeone who enters a movie theater without purchasing
           a ticket and then proceeds to sit through the first few
25         minutes of a film would not ordinarily then be described as
           "seeking admission" to the theater. Rather, that person
26         would be described as already present there. Even if that
           person, after being detected, offered to pay for a ticket, one
27         would not ordinarily describe them as "seeking admission"
           (or "seeking" "lawful entry") at that point—one would say
28         that they had entered unlawfully but now seek a lawful
           means of remaining there."

*Lopez Benitez*, 2025 WL 2371588, at *7.

*ii.*

Indeed, the Government's and BIA's position conflicts with the implementing regulation for § 1225(b). *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024) (implementing regulations may provide a "useful reference point for understanding a statutory scheme" when issued "contemporaneously"). 8 C.F.R. § 235.3 describes Section 1225(b)(2) as applying to "any *arriving alien* who appears to the inspecting officer to be inadmissible." (Emphasis added.) The regulation thus contemplates that "applicants *seeking admission*" are a subset of applicants "roughly interchangeable" with "arriving aliens." *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025). "Arriving aliens" are specifically defined by regulation as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. This plainly does not describe Ms. Salcedo Aceros. Indeed, the DHS's Notice to Appear form similarly distinguishes between "arriving alien" and "alien present in the United States who has not been admitted or paroled." Dkt. No. 16-2.

☐ You are an arriving alien.
☒ You are an alien present in the United States who has not been admitted or paroled.
☐ You have been admitted to the United States, but are removable for the reasons stated below.

These regulations and forms presume that the term alien "seeking admission" has limited application, not the sweeping construction given to it by the BIA.

*iii.*

Another "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Here, the Government's interpretation would "nullify" a recent amendment to the immigration statutes. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025). Section 1226 generally establishes a discretionary detention framework, but provides that for certain noncitizens, detention is mandatory. Section 1226(c). In January of *this year*, Congress amended Section 1226 to add an additional category of citizens subject to mandatory detention. Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). This category includes noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one of certain enumerated crimes. *Id.* If the Government's view is correct, however, all noncitizens who are inadmissible are *already* subject to mandatory detention under § 1225(b)(2), whether or not they have been charged with a

qualifying crime and thus are subject to § 1226(c). This view would render the Laken Riley Act a meaningless amendment, since it would have prescribed mandatory detention for noncitizens already subject to it. But "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). If Congress amended Section 1226 to create mandatory detention for certain inadmissible noncitizens, it follows that those noncitizens were not already subject to mandatory detention. Thus, the scope of Section 1225(b)(2) cannot be as broad as the government argues.

iv.

In addressing whether a noncitizen who has lived for years within the United States can be considered "seeking admission," the BIA expressed concern that if a noncitizen is not "admitted" to the United States but is not deemed "seeking admission," then the noncitizen's legal status would present a "legal conundrum." *Id.* at 221. The BIA did not further elaborate, but presumably its concern was that such an individual would have no legal status under the immigration code. This concern is misplaced. The statute explicitly provides a term of art for someone who is not "admitted" but is not *necessarily* "seeking admission": such noncitizens fall into the broader category of "applicants for admission." As noted, otherwise the language in 1225(b)(2), which treats noncitizens "seeking admission" as a subset of "applicants for admission" would be superfluous. All "applicants for admission" have some legal status whether they belong to the subset of those seeking admissions or not.

The BIA also reasoned that petitioner's argument for a narrower construction of Section 1225(b)(2) left unanswered which applicants for admission would be covered by that section if applicants for admission who have lived within the United States for years are excluded from its reach. *Id.* In other words, the BIA believed that an interpretation of § 1225(b)(2) that does not cover all applicants for admission would render § 1225(b)(2) an empty set. Not so. Most obviously, § 1225(b)(2) applies to arriving noncitizens who are inadmissible on grounds other than 8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7) (which are the grounds that put an arriving noncitizen on the track for expedited removal). The statute governing inadmissibility lists ten grounds for inadmissibility, many of which have distinct sub-grounds. *See* 8 U.S.C. § 1182(a)(1)-(10). There are thus arriving noncitizens inadmissible on these other bases who would fall under Section 1225(b)(2), as opposed to Section 1225(b)(1). Section 1225(b)(2) would not be a null set even if narrowly construed.

v.

The BIA acknowledged that the Government's interpretation of § 1225(b)(2) makes it redundant with § 1226(c)'s mandatory

detention provisions, and renders superfluous Congress' recent amendment, but nevertheless maintained that this redundant interpretation is not problematic. But as noted above, this conclusion is inconsistent with conventional rules of statutory interpretation. Further, the BIA failed to recognize that interpreting § 1225(b)(2) as district courts have done would not render *any* section of the immigration code superfluous. Under the district courts' interpretation, Section 1225(b)(2) has a role within the statutory framework, applying to arriving aliens inadmissible on grounds other than the two that allow for expedited removal, as noted above.

*vi.*

The BIA's consideration of the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is also unpersuasive. Prior to 1996, the immigration laws distinguished individuals based on "entry" rather than admission. *Hing Sum v. Holder*, 602 F.3d 1092, 1099 (9th Cir. 2010). Noncitizens who had effected an "entry" into the United States were subject to deportation proceedings, while those who had not made an "entry" were subject to "more summary" exclusion proceedings. *Id.* at 1099–100 (9th Cir. 2010). To remedy this, the IIRIRA substituted "admission for entry" and replaced deportation and exclusion proceedings with a general "removal" proceeding. *Id.* In the BIA's view, this indicates that in enacting IIRIRA Congress sought to create completely level treatment for noncitizens in removal proceedings, regardless of whether they are living in the United States or encountered at the border. It would therefore follow that a provision like § 1225(b)(2) would not differentiate between noncitizens based on their presence in the United States, or the length of that presence.

But the BIA erred in its analysis by identifying *one* of Congress' concerns in enacting IIRIRA and then treating it as Congress's sole concern driving the statute. Congress was indeed focused on ensuring that there was "no reward for illegal immigrants or visa overstayers." H.R. REP. 104-469, 12. But Congress addressed this concern: the IIRIRA consolidated exclusion and deportation procedures into a single procedure and provided that noncitizens "who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization." *Id.*

In making these changes, Congress did not fully disrupt the old system, including the system of detention and release. In fact, according to the legislative record, "Section 236(a) [1226(a)] restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." H.R. REP. 104-469, 229. Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime

by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a) –the scope of which Congress did not alter. *See Vazquez v. Bostock*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (citing H.R. Rep. No. 104-469, pt. 1, at 229).

Accordingly, the Court finds the well-reasoned decisions of the many district courts that have rejected the Government's expansive view of 1225(b)(2) far more persuasive than the new BIA ruling, a ruling at odds with its prior decisions and DHS's actions over the past thirty years.

*Salcedo Aceros*, 2025 WL 2637503 at *8–12. This Court agrees with the reasoning of *Salcedo* and joins the numerous other district courts that have rejected the government's recent interpretation of the relationship between § 1225 and § 1226.

b.    *Due Process Clause Protections*

Mrs. Sabi Polo contends that her continued detention violates due process. (*See* Doc. 2 at 17–19.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

1    Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all

2    "applicants for admission," Respondents fail to contend with the liberty interest created by the

3    fact that the Petitioner in this case was released on recognance in 2021, *prior to the*

4    *manifestation of this interpretation*.

5         Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

6    U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

7    applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL

8    2084921at *3. In *Mathews*, the Court determined the following:

9              [O]ur prior decisions indicate that identification of the specific
               dictates of due process generally requires consideration of three
10             distinct factors: First, the private interest that will be affected by the
               official action; second, the risk of an erroneous deprivation of such
11             interest through the procedures used, and the probable value, if any,
               of additional or substitute procedural safeguards; and finally, the
12             Government's interest, including the function involved and the
               fiscal and administrative burdens that the additional or substitute
13             procedural requirement would entail.

14   During her time on recognance, Petitioner built a life outside detention, has been gainfully

15   employed, and has supported family members, including her U.S. citizen spouse. Petitioner has a

16   substantial private interest in being out of custody, which would allow him to continue in these

17   life activities. As other courts have done, the Court concludes that Respondents' interest in

18   continuing to detain Petitioner is slight. Moreover, there has been no change in any of Petitioner's

19   circumstances that would warrant a finding that she is a flight risk or a danger to the community.

20   There is no dispute that Petitioner does not have a criminal record.

21        Finally, as Mrs. Sabi Polo points out and as evidenced by the result of her September 25,

22   2025 hearing, under current BIA interpretations, there is no administrative mechanism for her to

23   request a bond hearing from an IJ because such a request will necessarily be denied. Thus, the

24   Court concludes that Mrs. Sabi Polo has demonstrated a likelihood of success on the merits on her

25   Due Process claim.

26        2.    Irreparable Harm

27        "It is well established that the deprivation of constitutional rights 'unquestionably

28   constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

*Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has established irreparable harm.

        3.    <u>Balance of the Harms/Public Interest</u>

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as mentioned, there appears to be no dispute that there is no evidence that Petitioner poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Petitioner.

### 4.    Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

### 5.    Burden of Proof for Redetention

Petitioner requests any further relief the Court deems just and proper. (Doc. 1 at 28.) In related cases, the Court has addressed the burden of proof required to re-detain individuals like Petitioner. In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

*Id.* at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a)

1  does not have a right to a second bond hearing when the only changed material condition since

2  their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did

3  not address the burden of proof applicable under the present circumstances.

4      *Pinchi* went on to discuss why the calculus changes for an individual who had been

5  paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing
> provided under section 1226(a) provides constitutionally sufficient
> process for those noncitizens who have never previously been
> detained and released by DHS, [Petitioner's] circumstance is
> different. Her release from ICE custody after her initial
> apprehension reflected a determination by the government that she
> was neither a flight risk nor a danger to the community, and [she]
> has a strong interest in remaining at liberty unless she no longer
> meets those criteria. The regulations authorizing ICE to release a
> noncitizen from custody require that the noncitizen "demonstrate to
> the satisfaction of the officer that such release would not pose a
> danger to property or persons" and that the noncitizen is "likely to
> appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
> "Release [therefore] reflects a determination by the government that
> the noncitizen is not a danger to the community or a flight risk."
> *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),
> aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir.
> 2018). [Petitioner] was apprehended by ICE officers when she
> crossed the border into the United States [  ]. ICE then released her
> on her own recognizance. As ICE was not authorized to release
> [her] if she was a danger to the community or a flight risk, the
> Court must infer from [her] release that ICE determined she was
> neither. [Her] release from ICE custody constituted an "implied
> promise" that her liberty would not be revoked unless she "failed to
> live up to the conditions of her release." *Morrissey*, 408 U.S. at 482.
> The regulatory framework makes clear that those conditions were
> that she remain neither a danger to the community nor a flight risk.
> [She] justifiably relied on the government's implied promise in
> obtaining employment, taking on financial responsibility for her
> family members, and developing community relationships. The
> more than two years that she has spent out of custody since ICE
> initially released her have only heightened her liberty interest in
> remaining out of detention. Accordingly, [her] private interest in
> retaining her liberty is significant.

24  *Pinchi*, 2025 WL 2084921, at *4.

25      This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was

26  required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the

27  government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-

28  detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical

1    even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the

2    immigrant's initial release reflected a determination by the government that the noncitizen is not a

3    danger to the community or a flight risk. Since it is the government that initiated re-detention, it

4    follows that the government should be required to bear the burden of providing a justification for

5    the re-detention.

6                                    **CONCLUSION AND ORDER**

7            For the foregoing reasons, the Court **ORDERS:**

8            1.        Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a

9    Motion for Preliminary Injunction, and it is **GRANTED**.

10           2.        Because the government has no evidence that Petitioner poses a risk of flight or

11   poses a danger to the community, Petitioner **SHALL** be released **IMMEDIATELY** from DHS

12   custody. DHS **SHALL NOT** impose any additional restrictions on Petitioner, such as electronic

13   monitoring, unless that is determined to be necessary at a later custody hearing.

14           3.        Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-

15   arresting or re-detaining Petitioner absent compliance with constitutional protections, which

16   include at a minimum, predeprivation notice of at least seven days before a predeprivation

17   hearing at which the government will bear the burden of demonstrating by clear and convincing

18   evidence that she is likely to flee or pose a danger to the community if not arrested and at which

19   Petitioner may be represented by her counsel.

20           4.        The parties waive further briefing on the merits of the petition.

21

22   IT IS SO ORDERED.

23       Dated:   __October 17, 2025__                    _Jennifer L. Thurston_
                                                          UNITED STATES DISTRICT JUDGE

24

25

26

27

28